[No. S149344. Mar. 19, 2009.]

EVE PRINCE, Cross-complainant and Appellant, v.
PACIFIC GAS & ELECTRIC COMPANY, Cross-defendant and Respondent.

## Counsel

Luce, Forward, Hamilton & Scripps, Charles A. Bird, Peter H. Klee; Rankin, Landsness, Lahde, Serverian & Stock, Jon A. Heaberlin and Bernard P. Lahde for Cross-complainant and Appellant.

Sedgwick, Detert, Moran & Arnold, Frederick D. Baker and Steven P. Burke for Cross-defendant and Respondent.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Cross-defendant and Respondent.

## Opinion

**BAXTER, J.**—Joshua Jackson suffered serious injuries when he attempted to dislodge a kite from a power line maintained by Pacific Gas & Electric Company (PG&E) on the property of Eve Prince. The parties do not dispute that PG&E is immune from direct liability to Jackson under Civil Code[1] section 846, which provides with certain exceptions that a property owner "owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose." The question here is whether Prince, who might be liable to Jackson under one of the statutory exceptions, may recover on her cross-complaint alleging PG&E is liable for implied contractual indemnity based on its breach of a contractual duty owed to her to maintain its power line easement in repair.

We conclude that, even assuming a claim for implied contractual indemnity may be predicated on an alleged breach of an easement duty, PG&E's immunity from liability to Jackson under section 846 nonetheless bars Prince from recovering indemnification as a matter of law. We therefore reverse the judgment of the Court of Appeal and remand the matter to that court with directions to enter judgment in favor of PG&E.

### Factual and Procedural Background

The underlying facts are undisputed. Ten-year-old Joshua Jackson was flying a kite in his friend's backyard and suffered serious injuries when he used an aluminum pole to try to dislodge the kite from an electrical power line that traversed the neighboring property owned by the friend's grandmother, Eve Prince. (See *Jackson v. Pacific Gas & Electric Co.* (2001) 94 Cal.App.4th 1110, 1113 [114 Cal.Rptr.2d 831] (*Jackson*).)

---

[1] All statutory references are to this code unless otherwise indicated.

A guardian ad litem filed an action on Jackson's behalf against PG&E, which owned an easement to erect and maintain electrical power lines across the Prince property. In that action, the Court of Appeal upheld the trial court's determination that PG&E was immune from liability to Jackson under section 846, the so-called recreational use immunity statute. (*Jackson, supra*, 94 Cal.App.4th at p. 1113.) The court concluded that (1) based on the undisputed facts, Jackson's attempted retrieval of the kite was, as a matter of law, a recreational use of property within the contemplation of section 846; and (2) there were no facts supporting application of section 846's enumerated exceptions to immunity. (*Jackson*, at pp. 1114–1119.) The decision in that action became final in 2002. (*Id.* at p. 1121.)

Jackson's guardian ad litem subsequently filed a premises liability action against Prince. The complaint alleges that Jackson was "expressly invited" to use Prince's property, and that Prince knew or should have known that the lines hanging low over her property were high voltage power lines that posed a hazard to her guests. It further alleges that Prince used a 19-foot eight-inch aluminum pole to shake nut trees, that she left it under or near the low hanging power lines, and that she "created a foreseeable risk of injury or death should the metal pole be raised near the lines for any purpose."

Prince, in turn, filed a cross-complaint against PG&E. As relevant here, she alleges that, based on the easement granted to PG&E and on a statute that requires owners of easements to maintain them in repair (§ 845), PG&E breached a contractual duty owed to her to maintain its power lines in repair and thereby proximately caused Jackson's injury. Prince seeks indemnity on the ground that PG&E's alleged breach of duty has forced her to defend against Jackson's action and to be potentially liable for his damages.

PG&E filed a motion for summary judgment, contending Prince is barred from recovery because the gravamen of her cross-complaint is equitable indemnity, as opposed to express contractual indemnity. Relying on the undisputed evidence that Jackson was injured while engaged in a recreational use of its easement, PG&E argued its immunity under section 846 affords a complete defense to equitable indemnity. The trial court granted the motion, concluding that equitable indemnity is at issue and that PG&E's showing negating joint and several liability to Jackson entitled it to judgment as a matter of law.

The Court of Appeal reversed, finding that the indemnity Prince seeks is implied from PG&E's contractual obligations under the recorded easement documents, and is not based on any alleged breach of duty owed to Jackson. In the Court of Appeal's words, PG&E "has contractual duties to Prince that are separate and distinct from the general duty of care to Jackson that is the

subject of section 846. Prince's claim for implied contractual indemnification does not rely on, or seek to enforce, the duty that is limited by section 846, but instead relies on duties arising from the easement." The court concluded that, because joint and several liability to the injured plaintiff is not a requirement of implied contractual indemnity, PG&E's statutory immunity from suit by Jackson does not preclude Prince's indemnity claim.

We granted PG&E's petition for review.

DISCUSSION

This case presents two issues: (1) whether a claim for implied contractual indemnity may rest on the documents granting PG&E a power line easement and on section 845, which generally requires an easement holder to maintain its easement in repair; and (2) if so, whether PG&E's immunity from liability to Jackson under section 846 nonetheless bars Prince from recovering on an implied contractual indemnity theory.

A. *The Obligation of Indemnity*

■ In general, indemnity refers to "the obligation resting on one party to make good a loss or damage another party has incurred." (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97].) Historically, the obligation of indemnity took three forms: (1) indemnity expressly provided for by contract (express indemnity); (2) indemnity implied from a contract not specifically mentioning indemnity (implied contractual indemnity); and (3) indemnity arising from the equities of particular circumstances (traditional equitable indemnity).[2] (*Ibid.*; see *PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 318 [84 Cal.Rptr.2d 455, 975 P.2d 652].)

■ Although the foregoing categories of indemnity were once regarded as distinct, we now recognize there are only two basic types of indemnity: express indemnity and equitable indemnity. (See *Bay Development, Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1029–1030 & fn. 10 [269 Cal.Rptr. 720, 791 P.2d 290] (*Bay Development*).) Though not extinguished, implied contractual indemnity is now viewed simply as "a form of equitable indemnity." (*Id.* at p. 1029; see *E. L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 506–507 [146 Cal.Rptr. 614, 579 P.2d 505] (*E. L. White*).)

---

[2] As will be explained, implied contractual indemnity is but a form of equitable indemnity. Accordingly, this opinion uses the term "traditional equitable indemnity" to refer to the other form of equitable indemnity, which is not based on the existence of a contractual relationship between the indemnitor and the indemnitee.

We briefly review all three historic forms of indemnity, so as to provide context to Prince's claim of a right to implied contractual indemnity.

■ Express indemnity refers to an obligation that arises " 'by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances.' " (*Bay Development, supra,* 50 Cal.3d at p. 1029.) Express indemnity generally is not subject to equitable considerations or a joint legal obligation to the injured party; rather, it is enforced in accordance with the terms of the contracting parties' agreement. (*Markley v. Beagle* (1967) 66 Cal.2d 951, 961 [59 Cal.Rptr. 809, 429 P.2d 129].) In the context of noninsurance indemnity agreements, if a party seeks to be indemnified for its own active negligence, *or regardless of the indemnitor's fault,* the contractual language on the point "must be particularly clear and explicit, and will be construed strictly against the indemnitee." (*Crawford v. Weather Shield Mfg. Inc.* (2008) 44 Cal.4th 541, 552 [79 Cal.Rptr.3d 721, 187 P.3d 424]; see also *E. L. White, supra,* 21 Cal.3d at p. 507.) In this sense, express indemnity allows contracting parties "great freedom to allocate [indemnification] responsibilities as they see fit," and to agree to "protections beyond those afforded by the doctrines of implied or equitable indemnity." (*Crawford v. Weather Shield Mfg. Inc., supra,* 44 Cal.4th at pp. 551–552.) Prince makes no claim that PG&E expressly contracted to indemnify her for the type of damages alleged here.

■ Unlike express indemnity, traditional equitable indemnity requires no contractual relationship between an indemnitor and an indemnitee. Such indemnity "is premised on a joint legal obligation to another for damages," but it "does not invariably follow fault." (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 114 [32 Cal.Rptr.2d 263, 876 P.2d 1062] (*Western Steamship*).)[3] Although traditional equitable indemnity once operated to shift the entire loss upon the one bound to indemnify, the doctrine is now subject to allocation of fault principles and comparative equitable apportionment of loss. (*Bay Development, supra,* 50 Cal.3d at pp. 1029–1030, fn. 10; *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 591–598 [146 Cal.Rptr. 182, 578 P.2d 899] (*American Motorcycle*).)

■ A key restrictive feature of traditional equitable indemnity is that, on matters of substantive law, the doctrine is "wholly derivative and subject to whatever immunities or other limitations on liability would otherwise be

---

[3] "[J]oint and several liability in the context of equitable indemnity is fairly expansive." (*BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc.* (2004) 119 Cal.App.4th 848, 852 [14 Cal.Rptr.3d 721].) It extends beyond the term "joint tortfeasor" and may "apply to acts that are concurrent or successive, joint or several, as long as they create a detriment caused by several actors." (*Ibid.*)

available" against the injured party. (*Western Steamship, supra,* 8 Cal.4th at p. 115; see *Children's Hospital v. Sedgwick* (1996) 45 Cal.App.4th 1780, 1787 [53 Cal.Rptr.2d 725] (*Children's Hospital*) ["As against the indemnitee, the indemnitor may invoke any substantive defense to liability that is available against the injured party."].)[4] This rule "is often expressed in the shorthand phrase '. . . there can be no indemnity without liability.' " (*Children's Hospital, supra,* 45 Cal.App.4th at p. 1787.) Prince acknowledges she cannot recover traditional equitable indemnity because, under section 846, PG&E owed no duty of care to Jackson to keep its easement safe for his recreational entry or use.

■ That leaves implied contractual indemnity as Prince's sole potential basis for seeking indemnity from PG&E. Historically, this type of indemnity was available when two parties in a contractual relationship were both responsible for injuring a third party; recovery rested on the theory that "a contract under which the indemnitor undertook to do work or perform services necessarily implied an obligation to do the work involved in a proper manner and to discharge foreseeable damages resulting from improper performance *absent any participation by the indemnitee in the wrongful act precluding recovery.*" (*Great Western Furniture Co. v. Porter Corp.* (1965) 238 Cal.App.2d 502, 517 [48 Cal.Rptr. 76], italics added (*Great Western*); e.g., *S.F. Unified Sch. Dist. v. Cal. Bldg. etc. Co.* (1958) 162 Cal.App.2d 434 [328 P.2d 785] (*S.F. Unified*).) Now, however, implied contractual indemnity, like traditional equitable indemnity, is subject to comparative equitable apportionment of loss. (*Bay Development, supra,* 50 Cal.3d at pp. 1029–1030, fn. 10.)

PG&E argues its immunity under section 846 shields it from liability for implied contractual indemnity. PG&E additionally contends there is no basis here for implying a right of contractual indemnity because Prince and PG&E were not in a contractual relationship with each other and because PG&E owed no contractual duty to Prince under the easement grant.

---

[4] In *Western Steamship, supra,* 8 Cal.4th 100, we held that section 3333.2's limit on noneconomic damages in actions against health care providers limited a hospital's indemnification obligation to a ship owner. (See also *Children's Hospital, supra,* 45 Cal.App.4th 1780 [anesthesiologist's exoneration from liability in patient's prior malpractice action barred hospital's equitable indemnity action against anesthesiologist]; *Colich & Sons v. Pacific Bell* (1988) 198 Cal.App.3d 1225 [244 Cal.Rptr. 714] [consistent with a tariff limiting telephone company's negligence liability to its customers, contractor could not recover equitable indemnity against Pacific Bell for ordinary negligence but could seek indemnification for gross negligence].)

We need not resolve PG&E's latter contentions because, even assuming the existence of a sufficient contractual relationship and duty, PG&E's immunity from liability to Jackson bars Prince from recovering implied contractual indemnity in any event.

### B. *The Effect of PG&E's Recreational Use Immunity*

█ Section 846 provides in pertinent part: "An owner of any estate or any other interest in real property, whether possessory or nonpossessory, owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose or to give any warning of hazardous conditions, uses of, structures, or activities on such premises to persons entering for such purpose, except as provided in this section." (§ 846, 1st par.) By its own terms, however, section 846 does not limit the liability which otherwise exists when (1) there has been a willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity; (2) permission to enter the premises was granted in exchange for consideration; or (3) the injured person was expressly invited rather than merely permitted to enter the premises. (§ 846, 4th par.) Section 846 was enacted "to constrain the growing tendency of private landowners to bar public access to their land for recreational uses out of fear of incurring tort liability." (*Hubbard v. Brown* (1990) 50 Cal.3d 189, 193 [266 Cal.Rptr. 491, 785 P.2d 1183].) The immunity clearly extends to easement owners, given the statute's " 'exceptionally broad and singularly unambiguous' definition of protected property 'interests.' " (*Miller v. Weitzen* (2005) 133 Cal.App.4th 732, 736 [35 Cal.Rptr.3d 73] [finding § 846 protected holders of an encroachment permit]; see also *Hubbard v. Brown, supra,* 50 Cal.3d at pp. 196–197 [holder of a permit to graze livestock on federal lands].)

For purposes of our analysis, we emphasize the parties do not dispute that PG&E owed no duty of care to Jackson, who was injured while engaging in a recreational use of PG&E's easement. Nor do they dispute that PG&E is therefore immune from liability to Jackson under section 846. However, Jackson's premises liability action against Prince remains pending due to triable issues of material fact regarding the applicability of section 846's express invitation exception to immunity and the existence of a duty of care.[5]

█ As indicated above, traditional equitable indemnity differs significantly from express contractual indemnity, in that the former is not available in the absence of a joint legal obligation to the injured party. (*Children's*

---

[5] In *Jackson, supra,* 94 Cal.App.4th 1110, the Court of Appeal held that, if Jackson received an express invitation from his friend's mother to enter the Prince property, under authority given to the mother by Prince, such invitation did not abrogate PG&E's immunity under section 846. (*Jackson, supra,* at p. 1119.) That holding is not at issue here.

*Hospital, supra,* 45 Cal.App.4th at p. 1787; see *ante,* fn. 3.) Consequently, as to matters of substantive law one may defend against a traditional equitable indemnity action by relying on "whatever immunities or other limitations on liability would otherwise be available" against the injured party (*Western Steamship, supra,* 8 Cal.4th at p. 115). The principal question for us is whether or not a requirement of a joint legal obligation also applies when implied contractual indemnity is at issue. We conclude the answer is yes, based on the underlying rationale of this common law doctrine and the case law that has developed over the years.

*S.F. Unified, supra,* 162 Cal.App.2d 434, the seminal case validating the implied contractual indemnity doctrine in California, makes it abundantly clear the doctrine originated as a means to equitably shift the risk of loss from one joint tortfeasor to another when both were deemed liable to the injured party. In *S.F. Unified,* the plaintiff school district had entered a contract with the defendant maintenance company for window washing in certain city schools. The contract required the defendant's use of stepladders in washing the windows " '[i]n all schools that have Hauser window sashes' " and provided " 'the [defendant] is held responsible for payment of any and all damages resulting from his operations.' " (*Id.* at p. 437.) The defendant's employee was injured while washing a Hauser window at a school, and it was shown that, at the time of the accident, the defendant was not following the contractually mandated stepladder procedure for cleaning a Hauser window. (*Ibid.*) The injured employee successfully sued the school district on the ground it had not provided him with a safe place to work. After satisfying the judgment, the school district sued the defendant for indemnity. The trial court granted a nonsuit, and the Court of Appeal reversed. (*Id.* at pp. 435–436.)

In determining whether the trial court correctly held, as a matter of law, that the defendant maintenance company was not liable for the damages the plaintiff school district paid to the injured party, the Court of Appeal started by commenting there was "no doubt" that the school district and the defendant were joint tortfeasors with respect to the injuries of the defendant's employee. (*S.F. Unified, supra,* 162 Cal.App.2d at p. 444.)[6] The court next observed that the common law rule governing at the time of the accident generally barred any right of contribution between joint tortfeasors. (162 Cal.App.2d at pp. 443–444.) In assessing whether the case presented any basis for an exception to the rule of noncontribution, the Court of Appeal sought guidance from 140 American Law Reports 1306, which contained an

---

[6] The Court of Appeal elsewhere observed that the defendant maintenance company was not liable to its employee in tort (i.e., for the full measure of tort damages) because of the Workmens' Compensation Act then in effect. (*S.F. Unified, supra,* 162 Cal.App.2d at p. 440.)

annotation on the subject: " 'Contribution or indemnity between joint tort-feasors where injury to third person results from violation of a duty which one tort-feasor owes to other.' " (*S.F. Unified*, at p. 444.)[7]

According to that annotation, " 'the courts in a few cases have added another exception [to the general rule of noncontribution] to the effect that where the injury which resulted to a third person, *as to whom both of the parties were negligent or guilty of a wrongful act*, arose from a violation by the defendant of a duty owing by him to the plaintiff, or that where the defendant was a wrongdoer to the plaintiff but the plaintiff was not a wrongdoer to the defendant, *although both were liable to the person injured*, the plaintiff may recover contribution or indemnity, as the case may be, from the defendant notwithstanding the fact that his negligence also contributed to the third person's injury. [Citations.]' " (*S.F. Unified, supra*, 162 Cal.App.2d at p. 444, italics added.) The Court of Appeal in *S.F. Unified* reviewed the cases cited in support of the exception, and quoted one of the decisions reasoning that, even when joint tortfeasors were " 'equally culpable and equally liable' " to the injured party, " 'as between themselves, the plaintiff [seeking indemnity] was entitled to rely upon the defendants to discharge the duty because of their contractual relations, and the former could only be deprived of the right of indemnity by proof that it did in fact participate in some manner in the omission, beyond its mere failure to perform the duty imposed on both by the law.' " (*Id.* at p. 445, quoting *Phoenix Bridge Co. v. Creem* (N.Y.App.Div. 1905) 102 A.D. 354 [92 N.Y.S. 855, 856–857].) The other decisions supporting the exception were to the same effect. (E.g., *Otis Elevator Co. v. Maryland Casualty Co.* (1934) 95 Colo. 99 [33 P.2d 974, 977–978]; *S. A. L. Ry. Co. v. Am. Dist. Electric Protective Co.* (1932) 106 Fla. 330 [143 So. 316]; *Busch & Latta Painting Co. v. Woermann Construction Co.* (1925) 310 Mo. 419 [276 S.W. 614, 619] ["In all cases where one party creates the condition which causes the injury, and the other does not join therein, but is exposed to liability, and suffers damages on account of it, the rule that one of two joint tort-feasors cannot maintain an action against the other for indemnity does not apply."]; accord, *Weyerhaeuser S. S. Co. v. Nacirema Co.* (1958) 355 U.S. 563 [2 L.Ed.2d 491, 78 S.Ct. 438]; *Ryan Co. v. Pan-Atlantic Corp.* (1956) 350 U.S. 124 [100 L.Ed. 133, 76 S.Ct. 232].)[8] Finding the reasoning of the foregoing cases "quite convincing," the Court of

---

[7] Contribution and indemnity are related doctrines, but contribution " 'presupposes a common liability which is shared by the joint tortfeasors *on a pro rata basis*.' " (*Western Steamship, supra*, 8 Cal.4th at p. 108, fn. 6, italics added.)

[8] In *Ryan Co. v. Pan-Atlantic Corp., supra*, 350 U.S. 124, a shipowner contracted with a stevedoring company for performance of stevedoring operations, but the company's failure to perform the work safely contributed to the injury of one of its own employees. The United States Supreme Court held that, under these circumstances, the shipowner had an action for breach of contract to recover indemnity from the stevedoring company for the compensation the shipowner paid to the company's injured employee. In *Weyerhaeuser S. S. Co. v. Nacirema*

Appeal found it appropriate to adopt an implied contractual indemnity exception to the common law rule of noncontribution between joint tortfeasors. (*S.F. Unified, supra,* 162 Cal.App.2d at p. 448.)

Decisions subsequent to *S.F. Unified, supra,* 162 Cal.App.2d 434, emphasized that implied contractual indemnity and traditional equitable indemnity developed as related exceptions to the rule of noncontribution. In *Cahill Bros., Inc. v. Clementina Co.* (1962) 208 Cal.App.2d 367 [25 Cal.Rptr. 301], the Court of Appeal summarized the basic principles of "implied" indemnity, now commonly referred to as "equitable" indemnity, as follows. "The right to implied indemnity, while relatively recent in the law of California, is now well established. [Citations.] The distilled essence of these cases is that *where each of two persons is made responsible by law to an injured party the one to whom the right of indemnity inures is entitled to shift the entire liability for the loss to the other party.* Accordingly, a right of implied indemnification may arise *as a result of contract or equitable considerations.*" (*Id.* at pp. 375–376, italics added; see *Great Western, supra,* 238 Cal.App.2d at p. 516 [citing same].) As *Cahill Bros., Inc. v. Clementina Co.* indicated, however, where the right of implied or equitable indemnity was based on a "contractual relationship," it was not necessary to evaluate the "primary or secondary liability" of those made responsible by the law to the injured party. (*Cahill Bros.,* at p. 376, italics omitted; cf. *American Motorcycle, supra,* 20 Cal.3d at p. 583 [where no contractual relationship existed, a " 'passively' or 'secondarily' negligent tortfeasor" could shift its liability completely to a more directly culpable tortfeasor].)

Significantly, while early decisions appeared to recognize the sometimes vague and imprecise standard of recovery governing equitable indemnity, "the restitutionary nature of indemnification clearly emerged as a common thread." (*Western Steamship, supra,* 8 Cal.4th at p. 108.) That is, " '[t]he basis for indemnity is restitution, and the concept that one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay.' " (*Ibid.*)

As originally conceived, equitable indemnity was a doctrine that sought to prevent a more culpable tortfeasor from escaping liability altogether when a less culpable tortfeasor was involved. As an "all-or-nothing" rule, however, at times it operated to shift the entire loss to a party who was simply slightly more culpable than another. (*American Motorcycle, supra,* 20 Cal.3d at pp. 583, 594.) Recognizing this inequity, *American Motorcycle* modified

---

*Co., supra,* 355 U.S. 563, the high court followed *Ryan* and held that the right to indemnity did not depend on tort concepts of active/passive or primary/secondary negligence. (*Weyerhaeuser, supra,* 355 U.S. at p. 569.)

the equitable indemnity rule to permit a concurrent tortfeasor to obtain *partial* indemnity from other cotortfeasors on a comparative fault basis. (*Id.* at pp. 607–608.)

After *American Motorcycle*, this court emphasized that, although "the change from a shifting of loss to an apportionment of damages" was a significant development, it "did not affect the essential restitutionary character of equitable indemnity." (*Western Steamship, supra,* 8 Cal.4th at p. 109.) As we shall demonstrate below, the analyses in our post-*American Motorcycle* decisions, consistent with the earlier cases validating and applying the doctrine, support the conclusion that a party may defeat a claim for implied contractual indemnity by relying on an immunity otherwise available against the injured party.

In *E. L. White, supra,* 21 Cal.3d 497, we recognized that, notwithstanding the three separately identified forms of indemnity, the obligation of indemnity arises only "from either of two general sources." (*Id.* at p. 506.) "First, it may arise by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances." (*Ibid.*) "Second, it may find its source in equitable considerations brought into play *either* by contractual language not specifically dealing with indemnification *or* by the equities of the particular case." (*Id.* at p. 507, italics added.) Although a claim of implied contractual indemnity was not at issue in *E. L. White,* we relied on the distinction between express contractual indemnity and equitable indemnity to hold that the latter might still apply to apportion responsibility for a loss where an express indemnity agreement between the joint tortfeasors is found inapplicable to the injury. (*Id.* at pp. 507–510.)

Relying on the analysis in *E. L. White, supra,* 21 Cal.3d 497, our decision in *Bay Development, supra,* 50 Cal.3d 1012, also distinguished between express contractual indemnity, on the one hand, and the two forms of equitably based indemnity, on the other, and rejected the contention that a claim for implied contractual indemnity should be equated with a claim for express contractual indemnity. (*Id.* at pp. 1029–1032.) In particular, we observed that equating implied contractual indemnity with express indemnity could, anomalously, "accord an indemnitee greater rights than it would have under an express indemnification contract," because "in an implied indemnity situation a court could not apply the rules requiring specificity in express indemnification clauses." (*Id.* at p. 1033; see generally *Crawford v. Weather Shield Mfg. Inc., supra,* 44 Cal.4th at p. 552 [contract language must be "particularly clear and explicit" to afford protection beyond that available under doctrines of implied or equitable indemnity, e.g., indemnification regardless of the indemnitor's fault]; *E. L. White, supra,* 21 Cal.3d at p. 507.)

That consideration, as well as our observation that "equitable consider-ations have always played an integral role in defining the scope of the implied contractual indemnity doctrine" (*Bay Development, supra*, at pp. 1029–1030, fn. 10), supported our conclusion that "a claim for implied contractual indemnity is a form of equitable indemnity subject to the rules governing equitable indemnity claims" (*id.* at p. 1033, fn. omitted). In particular, we recognized that an implied contractual indemnity claim, like a traditional equitable indemnity claim, is subject to the *American Motorcycle* rule that a party's liability for equitable indemnity is based on its *proportional share of responsibility* for the damages to the injured party. (*Bay Development, supra*, 50 Cal.3d at p. 1031.)

Based on the foregoing, we ultimately held in *Bay Development* that, notwithstanding a different rule for express indemnity claims, an implied contractual indemnity claim may not be pursued against a party who has entered into a good faith settlement pursuant to Code of Civil Procedure section 877.6, subdivision (c).[9] (*Bay Development, supra*, 50 Cal.3d at p. 1020; cf. *C. L. Peck Contractors v. Superior Court* (1984) 159 Cal.App.3d 828, 834 [205 Cal.Rptr. 754].) Thus, in evaluating a settling defendant's potential proportionate liability to the injured party for purposes of the good faith settlement determination, "the trial court must take into account any contractual relationship between the settling and nonsettling defendants, and must consider how each party's performance of its contractual obligations *relates to its share of liability.*" (*Bay Development, supra*, 50 Cal.3d at p. 1034, italics added.)

■ Guided by the rationale driving the doctrine and the logical force and consistency of the analyses in *S.F. Unified, supra*, 162 Cal.App.2d 434, *E. L. White, supra*, 21 Cal.3d 497, and *Bay Development, supra*, 50 Cal.3d 1012, we conclude that implied contractual indemnity has always been subject to the rule that " 'there can be no indemnity without liability.' " (*Children's Hospital, supra*, 45 Cal.App.4th at p. 1787.) Application of this rule here compels the conclusion that PG&E's immunity from liability to Jackson under section 846 bars Prince from recovering on an implied contractual indemnity theory.

The Court of Appeal below relied on *Bear Creek Planning Com. v. Title Ins. & Trust Co.* (1985) 164 Cal.App.3d 1227 [211 Cal.Rptr. 172] to find that joint liability is not required because the implied contractual indemnity

---

[9] Code of Civil Procedure section 877.6, subdivision (c) provides: "A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negli-gence or comparative fault."

doctrine is grounded upon the indemnitor's failure to properly perform contractual duties owed to the indemnitee. As the Court of Appeal acknowledged, however, *Bay Development* disapproved *Bear Creek* to the extent it erroneously assumed that a claim for implied contractual indemnity is not a form of equitable indemnity and is not subject to comparative indemnity principles. (See *Bay Development, supra,* 50 Cal.3d at pp. 1031–1032 & fn. 12.) Furthermore, while *Bear Creek* correctly observed that the implied contractual indemnity doctrine is grounded upon the indemnitor's failure to properly perform contractual duties owed to the indemnitee, the decision was flawed to the extent it viewed the doctrine as akin or analogous to express contractual indemnity. Express indemnity has never required joint liability and, as indicated, equating the two doctrines would lead to anomalous results. (*Bay Development, supra,* 50 Cal.3d at p. 1033.)

More importantly, *Bear Creek* failed to appreciate that implied contractual indemnity is and always has been restitutionary in nature, meaning it is intended to address the situation where " 'one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay.' " (*Western Steamship, supra,* 8 Cal.4th at p. 108.) Indeed, our recognition that "a claim for implied contractual indemnity is a form of equitable indemnity subject to the rules governing equitable indemnity claims" (*Bay Development, supra,* 50 Cal.3d at p. 1033, fn. omitted) corrects any misimpression that joint liability is not a component of such claims.[10]

Prince relies on *S.F. Unified, supra,* 162 Cal.App.2d 434, *Ryan Co. v. Pan-Atlantic Corp., supra,* 350 U.S. 124, and *Weyerhaeuser S. S. Co. v. Nacirema Co., supra,* 355 U.S. 563, to argue that implied contractual indemnity is properly available even when the alleged indemnitor is "immune from direct liability" to the injured party. In those cases, the courts either held or recognized that a workers' compensation law did not preclude an entity from seeking implied contractual indemnity from a contractor for damages paid to an injured party, where the contractor was also the employer of the injured party. (*S.F. Unified, supra,* 162 Cal.App.2d at pp. 440–442 [Workmens' Compensation Act]; *Ryan Co. v. Pan-Atlantic Corp., supra,* 350 U.S. at pp. 128–132 [Longshore and Harbor Workers' Compensation Act

---

[10] Allowing a claim for implied contractual indemnity to proceed in the absence of any independent liability on the part of the indemnitor to the injured party would essentially subject the indemnitor to liability for the injured party's damages in connection with an alleged breach of contract. Our reiteration that indemnity is restitutionary in nature and our recognition of a shared liability requirement will avoid transforming a breach of contract claim into a vehicle for the recovery of tort damages.

(33 U.S.C. § 901 et seq.)]; see *Weyerhaeuser S. S. Co. v. Nacirema Co., supra,* 355 U.S. 563 [following *Ryan Co. v. Pan-Atlantic Corp.*].)[11] We are not convinced.

As PG&E points out, the compensation laws in those cases were not comparable to section 846 and the recreational use immunity it affords. Under section 846, an easement holder "owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose." Because PG&E owed no such duty to Jackson, there is no question that PG&E is immune from liability to Jackson. By contrast, the compensation laws did not operate to shield the employers from liability to their injured employees or otherwise negate any duty of care owing from employers to employees. To the contrary, those laws reflected compensation bargains, pursuant to which employers were held to assume liability for all industrial injuries, regardless of fault, in exchange for a limitation on the amount of that liability.[12] In light of the obvious differences between section 846 and the compensation laws, as well as the balance of the legal analysis appearing in *S.F. Unified, supra,* 162 Cal.App.2d at pages 444–449, these cases are not persuasive authority for disregarding the no-indemnity-without-liability rule.

Prince asserts that another decision, *Great Western, supra,* 238 Cal.App.2d 502, directly supports her position that "the indemnitor could be liable as a matter of contract even if it had been exonerated in a tort action by the injured person." *Great Western* involved an assault on a victim (Nizuk) by an employee (Gorges) of a "Thrift Club" that was managed and supervised by the indemnitor (Porter) but located within a furniture store owned by the indemnitee (Great Western). In a previous action, Nizuk had sued Porter and Great Western, but Porter obtained a summary judgment and a dismissal while Great Western eventually settled the action during the trial. Great Western then successfully sued Porter for implied contractual indemnity after demonstrating that, pursuant to a contract between the two of them, Porter, not Great Western, had complete charge of the entire Thrift Club operation, including the employment, management, and supervision of all its personnel, including Gorges. (*Great Western, supra,* 238 Cal.App.2d at p. 516.)

---

[11] Subsequent to the decisions in *S.F. Unified, supra,* 162 Cal.App.2d 434, *Ryan Co. v. Pan-Atlantic Corp., supra,* 350 U.S. 124, and *Weyerhaeuser S. S. Co. v. Nacirema Co., supra,* 355 U.S. 563, state and federal lawmakers enacted legislation barring recovery of implied or equitable indemnity against employers for injuries to their employees. (See Lab. Code, § 3864, added by Stats. 1959, ch. 955, § 1, p. 2986; *Cooper Stevedoring Co. v. Kopke, Inc.* (1974) 417 U.S. 106, 113, fn. 6 [40 L.Ed.2d 694, 94 S.Ct. 2174] [noting congressional intent to overrule *Ryan* insofar as it "made an employer circuitously liable for injuries to its employee, by allowing the employee to maintain an action for unseaworthiness against the vessel and allowing the vessel to maintain an action for indemnity against the employer"].)

[12] As already indicated, the Court of Appeal in *S.F. Unified* viewed the employer as a joint tortfeasor. (*S.F. Unified, supra,* 162 Cal.App.2d at p. 444.)

Prince's reliance on *Great Western* is misplaced. First, the decision made clear that Porter's successful defense of Nizuk's action was not res judicata on the issue of liability in the *Great Western* indemnity action. (*Great Western, supra,* 238 Cal.App.2d at pp. 508–514.) Second, it observed that Nizuk had failed to even assert the basis of liability against Porter that Great Western relied on in the indemnity action, and arguably suggested that, had Nizuk done so, he might have prevailed. (*Id.* at pp. 510–511.) Thus, the issue of the indemnitor's liability was litigated and resolved against the indemnitor in the *Great Western* indemnity action, while here it is conceded that the alleged indemnitor (PG&E) had no duty or liability to the injured party (Jackson). *Great Western* presents no parallel to this case.

Finally, Prince contends equitable considerations support her claim for implied contractual indemnity because (1) "the extraordinary hazard of high-voltage electricity emphasizes the need to give utilities strong incentive to maintain easements in safe condition," (2) "the typical liability limits of homeowners' insurance of typical servient tenement owners are unlikely to compensate the injured person," and (3) "the public benefits of electric power counsel that the rate paying public should pay for both public safety and injured persons' compensation through power rates." Although equitable considerations are properly considered when assessing the awarding of indemnity in individual cases, at least two of the identified concerns essentially amount to policy arguments for excluding utilities from the protective scope of section 846, and are more appropriately directed to the Legislature.[13] In any event, Prince's indemnity claim fails because she cannot make the required showing that PG&E bears some legal responsibility for Jackson's injuries.

In sum, we conclude, as a matter of law, that PG&E's immunity under section 846 bars Prince's claim for implied contractual indemnity. Contrary to Prince's assertions, there is nothing inequitable about this outcome. It is undisputed that Prince, like PG&E, may defend against Jackson's suit by claiming the benefit of the recreational use immunity provided in section 846. In fact, Prince herself relies on section 846 as an affirmative defense, and the only reason Jackson's case against her remains pending is that a disputed issue of material fact exists as to whether Prince expressly invited Jackson onto her property, so as to trigger a statutorily listed exception to immunity. (See § 846, 4th par.) If that issue is ultimately resolved in Jackson's favor, then there is no question that Prince's ability to claim the statutory immunity,

---

[13] To the extent Prince complains that a requirement of joint liability would expose property owners to extensive liability that rightfully should be borne by PG&E, we note that PG&E's immunity under section 846 would not be triggered unless a person were to engage in a recreational activity with respect to PG&E's easement. We perceive no unfairness in the Legislature's policy decision to provide for immunity when, for instance, kiteflyers poke metal poles into power lines, or people race up and down power poles.

and to avoid the damages for which she seeks indemnity (i.e., her costs in defending the action and her potential liability for Jackson's damages), will have been defeated by her own conduct. Under these circumstances, considerations of equity and fairness fail to support Prince's unilateral efforts to partially or completely shift responsibility for her loss to PG&E, which did nothing to except either Prince or itself from the statutory immunity.

That Prince has no recourse for indemnification against PG&E does not contravene the equitable premise of the indemnity doctrine. As we have recognized, " '[i]nevitably, whenever one concurrent tortfeasor is insolvent or immunized, either partially or completely, from liability, the remaining tortfeasors must pay more than an amount measured by their proportional responsibility for the injury. [Citations.]' [Citations.] Such are the realities, if not the vagaries, of multi-party litigation." (*Western Steamship, supra,* 8 Cal.4th at p. 117.)

## Disposition

We reverse the judgment of the Court of Appeal, and direct that court to enter judgment in favor of PG&E.

George, C. J., Kennard, J., Moreno, J., McIntyre, J.,* and McGuiness, J.,† concurred.

**WERDEGAR, J.,** Concurring.—I concur in the majority opinion. I write separately to address what I perceive to be a general misperception about the nature of implied contractual indemnity and to express my belief that irrespective of its nature, the doctrine no longer exists in California.

As the majority observes, implied contractual indemnity and equitable indemnity developed as related exceptions to the rule of noncontribution existing in this state before *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899]. (Maj. opn., *ante,* at pp. 1163–1164.) Equitable indemnity rests on the concept that " 'one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay.' " (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 108 [32 Cal.Rptr.2d 263, 876 P.2d 1062].) For that reason, as the majority rightly states, as to equitable indemnity " ' "there can be no indemnity without liability." ' " (Maj. opn., *ante,* at p. 1159.) Implied contractual indemnity, on

---

*Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

†Presiding Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

the other hand, historically arose from the concept that a party who breaches a contract is responsible for the resulting damages to its contractual partner. For example, in the seminal case of *S.F. Unified Sch. Dist. v. Cal. Bldg. etc. Co.* (1958) 162 Cal.App.2d 434 [328 P.2d 785], which the majority discusses (maj. opn., *ante*, at pp. 1161–1162), the appellate court reasoned the defendant maintenance company could be required to indemnify the school district even if the parties' contract contained no express provision for indemnity, holding, "such a warranty or agreement to indemnify would necessarily be implied" (*S.F. Unified*, at p. 449). In my view, *Bear Creek Planning Com. v. Title Ins. & Trust Co.* (1985) 164 Cal.App.3d 1227 [211 Cal.Rptr. 172] correctly summarized the law defining implied contractual indemnity when it explained: " '[W]here the right of implied indemnity arises from a contractual relationship between the indemnitor and the indemnitee, it is predicated upon the indemnitor's breach of such contract, the rationale of the cases being that a contract under which the indemnitor undertook to do work or perform services necessarily implied an obligation to do the work involved in a proper manner and to discharge foreseeable damages resulting from improper performance absent any participation by the indemnitee in the wrongful act precluding recovery.' [Citation.]" (*Id.* at p. 1237.) Thus, "implied contractual indemnity is based upon the premise that a contractual obligation to perform 'carries with it an implied agreement to indemnify and to discharge foreseeable . . . damages . . . ' " resulting to a contractual partner from the negligent performance of that obligation. (*Ibid.*)

Because implied contractual indemnity as originally conceived was based on a duty one party to the contract owed to the other, contrary to the majority's assertion (maj. opn., *ante*, at p. 1166) it has not always been a restitutionary doctrine that depended on the payment by the indemnitee of a legal obligation the indemnitor owed to an injured plaintiff. Rather, the indemnitor could be required to pay its contractual partner even if the indemnitor was immune from direct liability to the injured party. It is for that reason the defendant maintenance company in *S.F. Unified Sch. Dist. v. Cal. Bldg. etc. Co.*, *supra*, 162 Cal.App.2d 434, was required to pay the school district even though by reason of the workers' compensation laws in existence at the time, the maintenance company could not be required to pay the injured worker. (*Id.* at pp. 440–442.) And it is for that reason, contrary to the majority (maj. opn., *ante*, at pp. 1168–1169), that I believe Pacific Gas & Electric Company's (PG&E) immunity from direct liability to Joshua Jackson would not of itself bar Eve Prince from pursuing an action against PG&E for implied contractual indemnity as that doctrine was originally conceived.

Nonetheless, the doctrine of implied contractual indemnity has always presented significant conceptual and practical problems, some of which were alluded to in *Bay Development, Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1029–1033 [269 Cal.Rptr. 720, 791 P.2d 290], where a majority of this court

recognized that ordinary rules of express contractual indemnity could not reasonably be applied to a claim of implied contractual indemnity and disposed of the problem by characterizing implied contractual indemnity as simply a form of equitable indemnity. As I believe equitable indemnity provides a far better tool than traditional implied contractual indemnity for distributing liability between those directly or legally responsible for an injury or loss, I without reservation join in the majority's holding that a remedy under the doctrine of implied contractual indemnity may not be had when, as here, none would be available under the doctrine of equitable indemnity because the contracting party is immune from liability. But in my opinion, which admittedly is inconsistent with that expressed by the majority in *Bay Development*, relief in that event should be denied not because the doctrine of implied contractual indemnity is a form of equitable indemnity, but because the development of equitable indemnity has obviated any need for the unwieldy doctrine of implied contractual indemnity, and it should be abandoned.