Filed 12/19/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| C.W. HOWE PARTNERS INC. et al., | B290665 |
| Cross-complainants and Respondents, | (Los Angeles County Super. Ct. No. BC662798) |
| v. | |
| GREG MOORADIAN et al., | |
| Cross-defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Howard L. Halm, Judge. Affirmed.

Pitre & Teunisse and Randall J. Pitre for Cross-defendants and Appellants.

Clark Hill, Richard H. Nakamura Jr., Mehrdad Farivar and Christopher Menjou for Cross-complainants and Respondents.

_____

Greg Mooradian and Debra A. Mooradian appeal from the order denying their special motion to strike under Code of Civil Procedure section 425.16[1] directed to the cross-complaint filed against them by C.W. Howe Partners Inc. and its principal Carl William Howe (collectively the Howes) for express indemnity, equitable indemnity, contribution and declaratory relief.  The trial court ruled none of the Howes' claims arose from protected speech or petitioning activity within the meaning of section 425.16.  Although a claim of loss or potential loss is an essential prerequisite to any indemnification obligation, whether express or equitable, the Howes' cross-complaint did not arise from the filing of the Mooradians' lawsuit, but from the alleged breach of their agreement to indemnify the Howes for any liability attributable to information provided by the Mooradians or the Mooradians' representatives and the Mooradians' underlying fault with regard to their decisionmaking. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Mooradian Residence Construction Project*

The Mooradians, a married couple, were interested in remodeling or reconstructing their existing Los Angeles residence.  Although they had no prior design or construction experience, they discovered in 2014 the work of Erla Dogg Ingjaldsdottir and Tryggvi Thorsteinsson of Minarc, Inc. profiled in a book featuring cutting-edge homes that were environmentally conscious, energy efficient and built with major components prefabricated offsite.  The Mooradians were

---

[1]     Statutory references are to this code unless otherwise stated.

particularly drawn to a house located in Venice, California, which the book attributed to the following: "Minarc" as architect, "Core Construction" as builder, "mnm.MOD" as manufacturer and "C.W. Howe" as engineer. The home was constructed entirely from factory-made parts using a "patented panelized system," with structural components of metal and panels containing expanded polystyrene (EPS) insulation.

The Mooradians met with Ingjaldsdottir and Thorsteinsson, who represented that MNM Mod Corp., also known as MNMmod and mnmMOD, was one of their companies. MNM would custom manufacture offsite, in accordance with a design Ingjaldsdottir and Thorsteinsson created specifically for the Mooradians, metal-framed EPS panels using the patented panelized system. Thorsteinsson sent the Mooradians a proposed agreement pursuant to which Minarc would provide design and other services for the construction of a new single-family dwelling at the site of the Mooradians' existing residence.[2]

After the Mooradians signed the Minarc agreement, Thorsteinsson advised hiring a structural engineer and recommended Carl Howe. He explained Howe had worked with Minarc on other residential projects. Howe provided a proposal to Thorsteinsson and then, after being told the proposal was

---

[2] Under the heading "Key Milestones," the Minarc agreement included the following provisions: "Zoning regulations and codes studied"; "[d]rawings establishing all major elements and outline specifications are prepared including renderings, plans, elevation and sections of the building"; "[p]reparing Plans and specification for construction," but with "'[e]ngineering by others'"; "[m]eeting with local City planners"; "provide ready to issue permit plans"; and "[p]rovide field observations throughout the project to ensure compliance with the project documents."

3

accepted, submitted an August 18, 2014 letter agreement addressed to the Mooradians, printed on the letterhead of C.W. Howe Partners and signed by Howe as its principal (the Howe agreement).

2.  *The Agreement Between the Mooradians and C.W. Howe Partners*

Howe is a civil engineer licensed in California, and C.W. Howe Partners is in the business of providing structural design services for single-family homes and other building types. Structural design typically entails designing the foundation and structural framework for a building with specified materials to allow the building to withstand a variety of forces.

The August 18, 2014 Howe agreement stated on the subject line, "Contract for Structural Engineering Services:  Mooradian Residence – 'MnM mod' – Light Gage Steel Stud House, Green Roof Deck, Concrete Wall Front Elevation Elements."[3]  The first line of the agreement indicated the C.W. Howe Partners's engineering fee for the project was "[i]n accordance with our review of drawings produced by your Minarc."  Howe understood Minarc to be the designer of the Mooradian project.

Pursuant to the Howe agreement, the scope of services to be provided by C.W. Howe Partners included preparing a preliminary structural design, structural engineering calculations and structural construction documents.  The agreement listed services that were specifically excluded from the

---

[3]      The Howe agreement also stated the Mooradian project would "be a light gage 'C' – stud and joist platform-framed house where possible and structural steel where required."  According to Howe, the term "light gage" steel studs refers to studs of a certain grade of steel.

4

work to be performed by C.W. Howe Partners, including permit acquisition; construction means and methods or sequences; design and detailing of any nonstructural element; and coordination with architectural plans, which was instead to be performed by the "Designer," who was to be responsible for coordination of structural plans with all other professional disciplines.

Section 4 of the Howe agreement contained the heading "Client's Responsibilities," which was underlined, capitalized and in bold font. Section 4(a), titled "Information Provided by Client" in bold font, stated, "Client or Client's representative shall provide Engineer with all necessary information for performance of Engineer's work on a timely basis. Engineer shall be entitled to rely upon information provided by Client and Client's representative, and shall not be held responsible for accuracy or completeness of such information; or omission of pertinent information."

Section 4(b), titled "Indemnity – Client Provided Information" in bold font, provided, "Client agrees to indemnify, defend and hold harmless Engineer, [its] principals, agents and employees and subcontractors from and against all costs or liability, including but not limited to attorney fees and expert fees and costs; arising in whole or in part from errors, omissions or inaccuracies in any Project related information or documents provided by, or through Client, or any other person or entity, acting on Client's behalf; including but not limited to recommendations as to the type of foundation by Client's soils engineer. Engineer has no duty to defend the Client or any party claiming through the Client."

Greg Mooradian signed the Howe agreement on August 18, 2014 on behalf of the Mooradians, the "Client."

3. *Construction of the New House*

In the last quarter of 2014 the Mooradians' existing house was demolished to prepare for the construction of their new residence. Ingjaldsdottir, Thorsteinsson, Minarc and the Howes submitted architectural and structural drawings and specifications for approval by various departments and divisions of the City of Los Angeles, and the City issued a building permit in March 2015.

In April 2016 Core Construction and Development Inc., the general contractor the Mooradians hired at Ingjaldsdottir and Thorsteinsson's recommendation, discovered a permit for the roof deck could not be obtained because the deck railing exceeded the height limit of the applicable zoning ordinance. The Mooradians then learned Ingjaldsdottir, Thorsteinsson and Minarc were not California licensed architects and promptly terminated the relationship. Claiming substantial construction errors, the Mooradians also subsequently fired Core Construction and hired a completion contractor to finish the work.

4. *The Litigation*

On May 26, 2017 the Mooradians filed a complaint and on August 8, 2017 a first amended complaint against Ingjaldsdottir, Thorsteinsson, Minarc, MNM, the Howes, Core Construction and others. The operative first amended complaint generally alleged the defendants participated in a joint enterprise designed to facilitate a variety of unlawful practices, including the practice of architecture by persons who were not licensed architects and the manufacture, sale and installation of building materials without necessary City approvals. In its factual background section it

6

also alleged deficiencies in the Howes' civil engineering services and failures in the Howes' construction supervision.

Three causes of action—fraud, negligent breach of contract, and restitution and injunctive relief for unfair business practices—were asserted against the Howes. For the fraud cause of action and, by its reference to the fraud allegations, the unfair business practices cause of action, the Mooradians alleged the Howes claimed in or about 2012 to have engineered the EPS panels that have since been used in other residential structures constructed by its coconspirators; knew Ingjaldsdottir, Thorsteinsson, Minarc and MNM regularly incorporated into their designs for residential steel-framed structures the MNM-branded C-stud framed EPS panels that were manufactured by MNM offsite; and regularly served as the civil engineer for such structures.[4] The Mooradians further alleged, to fraudulently induce them to sign the Howe agreement and in furtherance of the defendants' conspiracy, the Howes intentionally suppressed certain material facts that should have been disclosed, including that Minarc was not a licensed architect; MNM did not have City approval to manufacture the EPS panels offsite; and the EPS

_____

[4] Debra Mooradian's February 21, 2018 declaration, which was filed in support of the Mooradians' special motion to strike, included, among other exhibits, a March 2012 posting on the website of C.W. Howe Partners referring to a "two story steel and styrofoam kit-of-parts systems" it had engineered for "Minarc Architects," as well as an August 2012 email from Howe to Thorsteinsson referring to the Howes "spending time, money, and effort on developing the MnM System."

7

panels included materials not approved for use in residential construction within the City.[5]

On December 22, 2017 the Howes filed a cross-complaint against the Mooradians for express indemnity, equitable indemnity, contribution and declaratory relief. In its general allegations the cross-complaint set forth verbatim sections 4(a) and 4(b) of the Howe agreement and asserted the Howes' structural design under the Howe agreement was to be based on information and drawings provided by the Mooradians' designer Minarc; the Mooradians, or Minarc as the Mooradians' representative, had provided the Howes an architectural design using elements labeled "EPS Panels"; and the selection of EPS panels had been solely by the Mooradians and/or Minarc. It also referred to the Mooradians' filing of their first amended complaint, alleging the Mooradians in their first amended complaint admitted the EPS panels had been specified in plans prepared by Minarc, manufactured by an entity owned by Minarc's owners and featured as the subject of various representations by the Minarc's owners and of Minarc's and MNM's website postings that the Mooradians had reviewed.

For the express indemnity claim, the Howes alleged the Mooradians had agreed to the indemnification provisions of the Howe agreement, which obligated them to indemnify, defend and

_____

[5]     For the negligence-based cause of action, the Mooradians alleged the Howes' negligence included preparing structural plans referring to Minarc as an architect, participating in the delivery of unapproved EPS panels and failing to detect MNM was not approved by the City to manufacture or assemble the EPS panels offsite.

hold harmless the Howes for any liability arising from the use of the EPS panels as asserted in the Mooradians' first amended complaint, but breached the agreement by failing and refusing to comply with their indemnification obligations.

For the equitable indemnity claim, the Howes denied liability for the events described in the Mooradians' first amended complaint arising from the Mooradians' and/or Minarc's decision to use the EPS panels. The Howes claimed that the Mooradians and/or Minarc were wholly or partially responsible for any injuries arising from their decision to use the EPS panels and that the Mooradians should be required to pay a share of any liability imposed on the Howes in proportion to the Mooradians' comparative negligence.

The contribution claim alleged the Howes were entitled to contribution from the Mooradians because of any judgment against Howe as a result of the Mooradians' first amended complaint. By their declaratory relief claim, the Howes sought a declaration of the Mooradians' obligation to indemnify the Howes, their duty to pay the Howes' costs of defense and their comparative liability for any damages claimed in the first amended complaint.

5. *The Mooradians' Special Motion To Strike*

The Mooradians responded to the Howes' cross-complaint by filing a section 425.16 special motion to strike, which was supported by the Mooradians' declarations. In their moving papers the Mooradians argued the Howes' cross-claims arose from the Mooradians' acts in furtherance of their right of petition within the meaning of section 425.16—specifically, from the filing of the Mooradians' complaint. The Mooradians also argued the

9

Howes could not establish a probability of prevailing on their claims.

In their opposition the Howes disputed their cross-claims arose from actions in furtherance of a right of petition.[6]  They contended their cross-complaint did not allege the Mooradians' wrongful act was the filing of the complaint, which constituted arguably protected activity, but rather the breach of the obligation to indemnify the Howes for any liability attributable to information provided by the Mooradians or the Mooradians' representatives.

In his declaration supporting the opposition Howe stated, in preparing structural designs, C.W. Howe Partners relies on information provided by others, including architects, designers and other consultants, who are typically hired directly by the property owner.  Because the services of C.W. Howe Partners are intertwined with services others provide, C.W. Howe Partners typically includes the provisions set forth in sections 4(a) and 4(b) of the Howe agreement.  For the Mooradian residence, C.W. Howe Partners based the structural design from the set of plans by the Mooradians' designers, with whom C.W. Howe Partners did not have a contractual relationship.  Howe further explained C.W. Howe Partners had no role in the selection of the insulation material, a nonstructural item, used in the Mooradian project.  Moreover, the decision whether to use framing assemblies fabricated offsite or onsite pertains to means, methods and sequences of construction excluded from the scope of work under the Howe agreement.

---

[6]     The Howes' opposition also disputed they could not establish the probability of prevailing on their claims.

10

The trial court heard the Mooradians' special motion to strike on April 18, 2018. After taking the matter under submission, the court later that same day denied the motion, ruling the Mooradians had failed to establish the Howes' cross-complaint arose from an act in furtherance of the Mooradians' right of petition or free speech. The court, however, denied the Howes' request for attorney fees, finding the arguments advanced by the Mooradians "were not completely and totally without merit." The Mooradians filed a timely notice of appeal. (§ 904.1, subd. (a)(13).)[7]

## DISCUSSION

1. *Section 425.16, the Anti-SLAPP Statute,[8] and the "Arising From" Requirement*

Section 425.16 provides, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a

---

[7] Although the Mooradians' notice of appeal failed to specify the date of the order being appealed, there is no question they sought review of the April 18, 2018 order denying their special motion to strike, which was the only appealable order included in their designation of the record on appeal. (See Cal. Rules of Court, rule 8.100(a)(2) [notice of appeal "must be liberally construed"]; *D'Avola v. Anderson* (1996) 47 Cal.App.4th 358, 362 [reviewing court may consider the contents of the designation of the record in determining whether a respondent has been misled by the notice of appeal].) The Howes do not contend they were prejudiced in any way by that omission.

[8] SLAPP is an acronym for "strategic lawsuit against public participation." (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 413, fn. 2.)

11

public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

Pursuant to section 425.16, subdivision (e), an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

In ruling on a motion under section 425.16, the trial court engages in a two-step process. "First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.) "Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002)

12

29 Cal.4th 82, 89 (*Navellier*), italics omitted.)  If the moving party fails to demonstrate that any of the challenged claims for relief arise from protected activity, the court properly denies the motion to strike without addressing the second step (probability of success).  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 80-81; *Trilogy at Glen Ivy Maintenance Assn. v Shea Homes, Inc.* (2015) 235 Cal.App.4th 361, 367.)

"A claim arises from protected activity when that activity underlies or forms the basis for the claim."  (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062-1063 (*Park*).)  Thus, "[t]he defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute.  A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.'"  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884 (*Wilson*); accord, *Park*, at p. 1060.)  "'[T]he mere fact that an action [or claim] was filed after protected activity took place does not mean the action [or claim] arose from that activity for the purposes of the anti-SLAPP statute.'"  (*Park*, at pp. 1062-1063; see *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621 ["a claim does not 'arise from' protected activity simply because it was filed after, or because of, protected activity, or when protected activity merely provides evidentiary support or context for the claim"].)  "To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.'"  (*Wilson*, at p. 884; accord, *Park*, at p. 1063.)

We review de novo an order granting or denying a special motion to strike under section 425.16 (*Wilson, supra*, 7 Cal.5th at p. 884; *Park, supra*, 2 Cal.5th at p. 1067), considering the parties' pleadings and affidavits describing the facts on which liability or defenses are predicated.  (§ 425.16, subd. (b)(2); see *Navellier, supra*, 29 Cal.4th at p. 89; see also *San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76, 94.)

2.  *The Howes' Cross-complaint Does Not Arise from the Mooradians' Protected Petitioning Activity*

The Howes' causes of action for express and equitable indemnity constitute the essence of their cross-complaint.[9] "Express indemnity refers to an obligation that arises "'by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances"'" and "is enforced in accordance with the terms of the contracting parties' agreement."  (*Prince v. Pacific Gas &*

_____

[9]     In addition to their claims for express and equitable indemnity, the Howes alleged causes of action for contribution and declaratory relief.  However, "the dichotomy between [contribution and indemnity] is more formalistic than substantive," and "'[[i]ndemnity] is only an extreme form of contribution.'"  (*American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 591 & fn. 3; see *Prince v. Pacific Gas & Electric Co.* (2009) 45 Cal.4th 1151, 1162, fn. 7 ["[c]ontribution and indemnity are related doctrines, but contribution "'presupposes a common liability which is shared by the joint tortfeasors *on a pro rata basis*"'"].)  As for the Howes' request for declaratory relief, the Mooradians acknowledge in their opening brief that this claim "is predicated solely upon their claim for indemnity and defense."

14

*Electric Co.* (2009) 45 Cal.4th 1151, 1158 (*Prince*); see *Valley Crest Landscape Development, Inc. v. Mission Pools of Escondido, Inc.* (2015) 238 Cal.App.4th 468, 481 [applying four-year statute of limitations for breach of written contract to express indemnity claim because, by bringing claim for express indemnity under subcontract, "Valley Crest was, in effect, suing . . . for breach of contract"]; *Ranchwood Communities Limited Partnership v. Jim Beat Construction Co.* (1996) 49 Cal.App.4th 1397, 1417 ["we must treat the cross-complaints' causes of action for express indemnity as contract based"].) "[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821; accord, *Professional Collection Consultants v. Lujan* (2018) 23 Cal.App.5th 685, 690; see *Four Star Electric, Inc. v. F & H Construction* (1992) 7 Cal.App.4th 1375, 1380 ["[a]n indemnitee seeking to recover on an agreement for indemnification must allege the parties' contractual relationship, the indemnitee's performance of that portion of the contract which gives rise to the indemnification claim, the facts showing a loss within the meaning of the parties' indemnification agreement, and the amount of damages sustained"].)

Equitable indemnity, which "requires no contractual relationship," "'is premised on a joint legal obligation to another for damages'"; it is "subject to allocation of fault principles and comparative equitable apportionment of loss." (*Prince, supra*, 45 Cal.4th at p. 1158.) "'The elements of a cause of action for [equitable] indemnity are (1) a showing of fault on the part of the indemnitor and (2) resulting damages to the indemnitee for

15

which the indemnitor is . . . equitably responsible.'" (*Bailey v. Safeway, Inc.* (2011) 199 Cal.App.4th 206, 217.)

The Mooradians contend the existence of a claim of loss to be indemnified is a necessary prerequisite to any indemnification obligation and argue the filing of their first amended complaint supplies an essential element of the Howes' cross-claims for indemnity. The element of "fault," they contend, connotes responsibility for a claim of loss; the element of "resulting damages" refers to damages arising from a claim of loss. They assert there would be no claim of loss without the filing of their first amended complaint.

To be sure, a cause of action arising from the defendant's (or, as applicable here, cross-defendant's) litigation activity directly implicates the right to petition and is subject to a special motion to strike. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 ["'[a] cause of action "arising from" defendant's litigation activity may appropriately be the subject of a section 425.16 motion to strike'"]; *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 741 [malicious prosecution action by its very nature arises out of defendant's constitutionally protected petitioning activity— the underlying lawsuit]; see *Navellier*, *supra*, 29 Cal.4th at p. 90.)

But to satisfy the first prong, the Mooradians had to establish the Howes' causes of action "arise from" the Mooradians' litigation activity; and they misunderstand the analysis employed to determine whether a claim arises from protected conduct. The "elements" analysis as articulated by the Supreme Court in *Park, supra,* 2 Cal.5th at page 1063 and adopted in *Wilson, supra,* 7 Cal.5th at page 884 does not mean any allegation of protected activity supporting an element of a cause of action subjects that cause of action to a challenge under

16

section 425.16. Courts should only consider the elements of the challenged cause of action as part of an analysis to determine what actions by the defendant form the basis for liability. As cautioned by the *Park* Court, in the first step of the anti-SLAPP analysis, care must be taken "to respect the distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim." (*Park*, at p. 1064.) As discussed, the Supreme Court in both *Park* and *Wilson* made clear "the speech or petitioning activity *itself*" must constitute "the wrong complained of." (*Wilson*, at p. 884; *Park*, at p. 1060.)

The filing of the Mooradians' first amended complaint is not the wrongful act forming the basis for the Mooradians' liability as alleged in the Howes' cross-claims. Rather, the alleged wrongful act that forms the basis for the express indemnity cause of action is the Mooradians' failure to indemnify, defend and hold harmless the Howes in breach of section 4(b) of the Howe agreement, including to indemnify the Howes from any liability arising from the use of the EPS panels selected by the Mooradians or the Mooradians' representative Minarc. Similarly, the alleged wrongful act supporting the equitable indemnity cause of action—the alleged "fault" for which they should be held equitably responsible for any damages suffered by the Howes—is the decision they or their representative Minarc made to use the EPS panels.[10]

---

[10] As the Mooradians indicate in their reply brief, the Supreme Court in *Baral v. Schnitt*, *supra*, 1 Cal.5th at page 396 stated, "When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded." The Howes' cross-claims, however, do not allege

17

*Navellier, supra*, 29 Cal.4th 82 illustrates the difference. In *Navellier* the Supreme Court held a claim for breach of a release clause in a contract was subject to section 425.16 because the alleged breach consisted of asserting claims in litigation (in a counterclaim in a federal lawsuit that had been initiated prior to the release agreement) that had purportedly been released under the contract: "In alleging breach of contract, plaintiffs complain about Sletten's having filed counterclaims in the federal action. Sletten, plaintiffs argue, 'counterclaimed for damages to recover money for the very claim he had agreed to release a year earlier' and 'was sued for that act.'" (*Navellier*, at p. 90; see *id.* at p. 89 ["[p]laintiffs . . . alleged that Sletten had committed breach of contract by filing counterclaims in the federal action"].)

Similarly, in *Moss Bros. Toy, Inc. v. Ruiz* (2018) 27 Cal.App.5th 424 the petitioning activity itself constituted the alleged breach. In that case an employer filed a breach of contract action against an employee alleging the employee had breached two arbitration agreements by failing to submit his employment-related disputes to arbitration, instead filing a putative class action complaint in superior court against the employer. The trial court granted the employee's special motion to strike. (*Id.* at pp. 430-432.) In affirming, the court of appeal relied, among other cases, on *Vivian v. Labrucherie* (2013) 214 Cal.App.4th 267, where a motion pursuant to section 425.16 successfully challenged a breach of contract action that had alleged protected activity constituted the breach: "There, the plaintiff's breach of contract claims were based on the defendant's

_____

any part of the Mooradians' breach or other wrongful conduct includes the protected activity of filing their lawsuit.

protected activity of making statements to internal affairs investigators and in family court papers . . . . Because the plaintiff was seeking to impose liability on the defendant for her acts of making protected statements, the plaintiff's action was based on protected activity." (*Moss Bros. Toy*, at pp. 438-439.) Unlike the plaintiffs in *Navellier* and *Moss Bros. Toy*, the Howes did not allege in their cross-complaint that by filing their lawsuit the Mooradians had breached the Howe agreement or otherwise engaged in wrongful activity.

Neither *Lennar Homes of California, Inc. v. Stephens* (2014) 232 Cal.App.4th 673 (*Lennar Homes*) nor the recent case from Division Four of this court, *Long Beach Unified School Dist. v. Margaret Williams, LLC* (Dec. 9, 2019, B290069) __ Cal.App.5th __ [2019 Cal.App. Lexis 1228] (*Williams*), which affirmed trial court orders granting special motions to strike first party contractual indemnity causes of action, provides persuasive support for the Mooradians' motion.

In *Lennar Homes* defendants Stella Stephens and Timothy and Melissa Young, a married couple, purchased homes from builder Lennar Homes of California, Inc., entering into agreements that required the homebuyers to indemnify and defend Lennar from any costs and liabilities arising from claims the homebuyers might make based on the builder's nondisclosure or incomplete disclosure of various items. Stella Stephens and Timothy Young, but not Melissa Young, were named plaintiffs in a federal class action lawsuit asserting claims of fraudulent nondisclosure and misrepresentation against Lennar. After dismissal of the federal action, Lennar sued all three homebuyers for express contractual indemnity to recover its attorney fees and costs in defending the federal action. The trial court granted the

19

homebuyers' section 425.16 motion, and the court of appeal affirmed. (*Lennar Homes*, *supra*, 232 Cal.App.4th at pp. 677-679.) Significantly, however, Lennar did not dispute on appeal that its cause of action for indemnity as asserted against Stephens and Timothy Young arose from actions in furtherance of their right to petition (*id.* at p. 680); Lennar argued Melissa Young had failed to satisfy the first prong of the anti-SLAPP analysis because, unlike her husband, she was not named as a plaintiff in the federal action (*ibid.*).[11] Applying authority holding that section 425.16 applies to one who did not personally engage in protected petitioning activity but who provided support for that activity, the appellate court concluded Timothy Young effectively brought suit on behalf of both himself and his wife, asserting rights belonging jointly to them, and the federal litigation therefore constituted an act in furtherance of Melissa Young's right of petition, even though she was not named as a plaintiff. (*Lennar Homes,* at pp. 681, 684.)

Selectively quoting from *Navellier*, *supra*, 29 Cal.4th 82, *Lennar Homes* relied on a facile "but for" analysis to conclude Lennar's claim against Melissa Young arose from protected activity because, but for the federal litigation, Lennar's indemnification claim would have no basis. (*Lennar Homes*,

---

[11] Lennar contended the express indemnity cause of action against Melissa Young did not arise from her own petitioning activity. Because Melissa Young had agreed "'to indemnify Lennar for costs incurred in defending a meritless suit by a third party (here Mr. Young),'" Lennar unsuccessfully attempted to characterize its claim against Melissa Young as a "'straightforward third-party indemnity claim.'" (*Lennar Homes*, *supra*, 232 Cal.App.4th at p. 684.)

*supra*, 232 Cal.App.4th at pp. 684-685.) The *Lennar Homes* court, which decided the case several years before the Supreme Court's clarification of proper section 425.16 analysis in *Wilson*, *supra*, 7 Cal.5th 871 and *Park*, *supra*, 2 Cal.5th 1057, did not consider whether the wrongful act giving rise to an express indemnity claim for purposes of the first prong of section 425.16 was the filing of the underlying action or the refusal to honor the contractual indemnification obligation.[12]

*Williams*, *supra*, ___ Cal.App.5th ___ involved a first party contractual indemnity claim filed by the Long Beach Unified School District as a cross-complaint in a lawsuit by Margaret Williams and Margaret Williams, LLC alleging the District had wrongfully terminated the LLC's contract to perform construction management and environmental compliance work for the District and unlawfully caused Williams's arsenic poisoning.[13] (*Id.* at p. ___ [2019 Cal.App. Lexis 1228, *1-2].) Relying on the truncated first prong reasoning in *Lennar Homes*, the *Williams* court concluded, "Here, the District's cross-claims for defense and

---

[12] As explained by Division One of the First District in *Wong v. Wong* (Dec. 13, 2019, A154286) __ Cal.App.5th __ [2019 Cal.App. Lexis 1252, *13], which involved a third party indemnity claim, "*Lennar Homes* was decided before *Park* and did not employ *Park's* elements-based analysis. The builder effectively conceded that the husband and the other woman had met their first-prong burden."

[13] In *Williams* the District's cross-complaint included a breach of contract cause of action; the LLC's contract contained an indemnity provision, which the District alleged the LLC breached by failing to accept the District's tenders of defense and indemnity. (*Williams, supra*, __ Cal.App.5th __ [2019 Cal.App. Lexis 1228, *9-11].)

21

indemnity likewise would have no basis without the Underlying Action in which it seeks to be defended and indemnified." (*Id.* at p. __ [2019 Cal.App. Lexis 1228, *17].) However, implicitly recognizing the flaw inherent in utilizing a simple "but for" analysis, rather than considering the elements of the challenged claims to determine what actions form the basis for liability, as required by *Park*, *supra*, 2 Cal.5th at page 1063, the *Williams* court went on to conclude, even if the District's cross-complaint for indemnity did not arise from the underlying action, it nonetheless arose from protected activity within the meaning of section 425.16, subdivision (e)(4), because funding or refusing to fund litigation (that is, refusing the District's demand for a defense and indemnification) constituted protected conduct in furtherance of petitioning activity and Williams and her LLC's lawsuit involved an issue of public interest (allegations of an environmental hazard at a construction site for a public school). (*Williams*, at p. __ [2019 Cal.App. Lexis 1228, *18].) The Mooradians do not, and cannot, assert that their refusal to honor the Howes' indemnity demand similarly implicates an issue of public interest.

In sum, the trial court properly determined the Mooradians failed to establish the Howes' cross-claims arose from protected activity.

## DISPOSITION

The order denying the Mooradians' special motion to strike is affirmed.  The Howes are to recover their costs on appeal.


PERLUSS, P. J.

We concur:


ZELON, J.


SEGAL, J.